**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| **JANICE R. CRAWLEY,** | : | |
| | : | **Bky. No. 04-35514 ELF** |
| Debtor. | : | |
| ──────────────────────── | : | |
| | : | |
| **JANICE ROUNDTREE-CRAWLEY,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | **Adv. No. 09-0276** |
| v. | : | |
| | : | |
| **EDUCATIONAL CREDIT** | : | |
| **MANAGEMENT CORPORATION,** | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I. INTRODUCTION

In this adversary proceeding, Plaintiff Janice Roundtree-Crawley ("the Debtor"), acting

pro se, seeks a discharge of her student loan obligations under 11 U.S.C. §523(a)(8).  Section

523(a)(8) provides that student loans are not dischargeable "unless excepting such debt from

discharge . . . would impose an undue hardship on the debtor and the debtor's dependents.  11

U.S.C. §523(a)(8).

It is settled law in this Circuit that a debtor seeking to discharge his or her student loans

must prove that:

> (1) based on current income and expenses, the debtor cannot maintain
> a "minimal" standard of living for himself or herself and his or her dependents
> if forced to repay the loans;

-1-

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and

(3) the debtor has made a good faith effort to repay the loans.

In re Faish, 72 F.3d 298, 305-06 (3d Cir. 1995)(quoting Brunner v. New York Higher Educ. Servs. Corp., 831 F.2d 395, 396 (2d Cir. 1987).  Courts in this circuit, as well as in the other circuits that have adopted this legal standard, regularly refer to it as "the Brunner test."

Defendant Educational Credit Management Corporation ("ECMC") opposes the Debtor's request for discharge of her student loans.  ECMC's primary contentions are that: (1) the Debtor did not satisfy the second prong of the Brunner test because she did not prove that her current financial difficulties are likely to persist for an extended period of time and (2) the Debtor cannot satisfy the third prong good faith requirement because she failed to avail herself of a federal administrative repayment program that would reduce her monthly payment to $0.00 per month for so long as her current financial condition does not improve.

As several courts have observed, §523(a)(8) imposes a "heightened standard for the discharge of student loans, one that imposes a "heavy burden" on the debtor.  See, e.g., In re Traversa, 2010 WL 1541443, at *10 n.19 (Bankr. D. Conn. Apr. 15, 2010) (citation omitted). After applying the "heightened standard" to the facts presented here, I find the case before me to be a close one in certain respects, but I conclude, nonetheless, that the Debtor has met her burden of establishing undue hardship under 11 U.S.C. §523(a)(8) and that she is entitled to the entry of an order determining her student loan debt to be dischargeable in this bankruptcy case.

## II.  PROCEDURAL HISTORY

This adversary proceeding arose in a somewhat unusual fashion.

The Debtor filed a petition under chapter 13 of the Bankruptcy Code on November 18,
2004.  (Bky. Doc. # 1).  On May 3, 2005, the bankruptcy case was converted to one under
chapter 7.  She received her chapter 7 discharge on September 29, 2005.  (Bky. Doc. # 82).

On June 17, 2009, nearly four years after receiving her discharge, the Debtor filed a
motion to reopen the bankruptcy case in order to seek a dischargeability determination with
respect to her student loan debt.[1]  The motion was uncontested and was granted on July 22, 2009.
On August 31, 2009, the Debtor instituted this adversary proceeding by filing a Complaint.
(Adv. Doc. #1).  ECMC filed an Answer to the Complaint on October 1, 2009.  (Adv. Doc. # 4).

Trial of this proceeding took place on May 24, 2010.  The parties were offered an
opportunity to file a post-trial memorandum of law in support of their respective positions.
ECMC submitted its brief on July 16, 2010.  The Debtor did not to file a responsive submission.

---

[1]      Prior to filing the motion to reopen, the Debtor filed another unsuccessful chapter 13
bankruptcy case.  See Bky. Case No. 07-14988 (dismissed for failure to file certain documents).

After this adversary proceeding commenced, the Debtor filed three other unsuccessful
chapter 13 cases.  The first, Bky. No. 10-12098, was dismissed due to the Debtor's failure to comply with
the Code's pre-petition credit counseling requirements, see 11 U.S.C. §109(h).  The second, Bky. No. 10-
12900, was dismissed for cause after the Debtor converted the case to chapter 7 because the Debtor was
ineligible to receive a chapter 7 discharge, see 11 U.S.C. §727(a)(8), and there seemed to be no further
purpose to the bankruptcy proceeding.  The third case, Bky. No. 11-10875, filed as a chapter 13 case on
February 7, 2011, is pending.

### III. FACTUAL FINDINGS

#### A.  The Debtor's Education and Student Loans

1. The Debtor attended Delaware State University from the fall of 1980 until 1985, when she

    graduated with two (2) baccalaureate degrees: one in Theater and another in English

    Literature.  (N.T. at 19, 38).

2. During college, the Debtor took a loan out every semester to pay for tuition, housing and

    food.  (N.T. at 39; Ex. ECMC-10 at 10).[2]

3. The Debtor is obligated on six (6) Promissory Notes for Guaranteed Student Loans ("the

    Notes") executed between December 2, 1980 and July 26, 1984.  (N.T. at 39-40; Ex.

    ECMC-11, ¶ 4).

4. The aggregate, original principal amount of the Notes was $10,000.00.  (ECMC-1).

5. Each of the Notes provided for a grace period in which repayment was not required, so long

    as the Debtor remained in school on at least a half-time basis.  (ECMC-2).

6. Under the Notes, the Debtor's obligation to repay commenced some time in 1986.[3]

7. Each Note provides for a loan term (i.e., a repayment period) of no more than fifteen (15)

    years and all but one (1) of the Notes expressly makes the loan term subject to the lender's

    right to grant a forbearance for "financial difficulties" and a longer period in which to repay

---

[2]    ECMC-10 is a copy of the transcript of the Debtor's pre-trial deposition.  It is re-paginated as part of a bound document collecting all of ECMC's exhibits.  In this Opinion, I will cite to original page numbers of the deposition, not the repagination.

[3]    It is not possible to be more specific based on the record, which suggests that the Debtor completed her education some time in 1985 and that the notes went into pay status nine (9) to twelve (12) months thereafter.  (See ECMC-2).

the loan.  (Id.).

8.  The aggregate balance due on the Notes (hereafter referred to collectively as "the Student

Loan") as of May 19, 2010 was $19,726.35, which consists of principal, interest, and

collection costs mandated by federal regulation.

9.  Interest on the Student Loan accrues at the fixed rate of 7% per annum.  (Exs. ECMC-2;

ECMC-11, ¶ 8).

10.  ECMC is the current holder of the Student Loan.  (Ex. ECMC-11, ¶ 7).[4]

## B.  The Debtor's Work History

11.  Upon graduation from college in 1985, the Debtor went to work full-time as a Field Services

Coordinator for the Girls Scouts of Delaware County, earning approximately $19,000.00 per

year.  (N.T. at 40-41; Ex. ECMC-10 at 13-14).[5]

12.  In 1987, she went to work at the Center for Literacy in Philadelphia where she taught adults

to read and assisted them in back-to-work programs.  At that job, she earned approximately

$22,000.00 per year.  (N.T. at 41-43; Ex. ECMC-10 at 15).

13.  Approximately two (2) years later in 1989, the Debtor left the Center for Literacy in order to

get married and move to Delaware.  (N.T. at 43; Ex. ECMC-10 at 15).

14.  In Delaware, while she was pregnant, the Debtor worked for a public relations firm as a

---

[4]    Pennsylvania Higher Education Assistance Agency ("PHEAA") was the original
guarantor of the Notes.  On or about September 29, 1986, after the Debtor defaulted on the Notes,
PHEAA paid the default claim made by the lender (Ex. D-11, ¶ 5).  On or about February 9, 2005,
PHEAA transferred all of its rights, title and interest in the Notes to ECMC.  (Id., ¶ 6).

[5]    Exhibit ECMC-10 is the transcript of the Debtor's deposition taken by ECMC on
February 3, 2010.

temporary receptionist for approximately two (2) months.  (Ex. ECMC-10 at 15).

15. By 1990, the Debtor separated from her husband and returned to the Girl Scouts in

Philadelphia to work as a field services coordinator.  She remained there until she was laid

off in 1995.  She earned approximately $25,000.00 per year during this time.  (N.T. at 43-44;

Ex. ECMC-10 at 15-16).

16. From 1996 to 1998, the Debtor worked part-time as a cashier at Macy's department store

earning approximately $10.00 per hour.  She also was on welfare.  For a six-month period

prior to obtaining the job at Macy's she worked for a temporary agency.  (N.T. at 108; Ex.

ECMC-10 at 17-18, 20).

17. In 1998, the Debtor left Macy's when she became pregnant.  She also had a bout of hepatitis

at the time.  The Debtor was out of work for approximately two (2) years thereafter.  (Ex.

ECMC-10 at 19).

18. In January, 2000, the Department of Public Welfare ("DPW") hired the Debtor to work as an

income maintenance case worker.  She worked at DPW until 2009.  (N.T. at 19, 26-28; Ex.

ECMC-10 at 20-21).

19. The maximum salary actually earned by the Debtor while employed by DPW was

approximately $37,000.00.  She had the potential to earn up to $55,000.00 if she had not

been absent from work due to illness so frequently during her employment.  (Ex. ECMC-10

at 22).

20. In 2000, when the Debtor accepted the job with DPW, she was pregnant and had an active

case of hepatis.  (Id. at 20).

21. While working at DPW, she was offered employment accommodations, including flexible

hours which allowed her to come in late or work half days.  (Id. at 24-25).

22. During at least seven (7) different time periods between January 2002 and December 2007,
the Debtor was on unpaid medical leave from her job with DPW, for three (3) to six (6)
months each, because of health-related issues.  Therefore, in those five (5) years, she was out
on medical leave for about half of the time.  The least amount of leave time she requested
during those years was a period of six (6) weeks.  (Id. at 22- 24, 82-83; Ex. P-1).

23. After returning to work from a six (6) month leave, at some point in 2007, her long-term
problem with depression flared up, as did her hypertension, which caused her to be absent
from work again for another six (6) months.  (Id. at 25).

24. When she returned to work in September 2008, she requested a part-time schedule so that
she could go to the psychiatrist and the hematologist.  By that time, the Debtor had
exhausted any leave available through the Family and Medical Leave Act.[6]  Thereafter,
DPW docked her time when she needed such leave.  (Id. at 26; Ex. P-1).

25. In December 2009, DPW terminated the Debtor's employment.  That same day, she applied
for unemployment compensation.  (N.T. at 26-28;  Ex. P-1 at 35-36).

26. The Debtor's gross wages (and total taxable income) in:

    a.  2007 totaled $27,504.00.  (Ex. ECMC-7).

    b.  2008 totaled $16,690.00.  (Ex. ECMC-8).

    c.  2009 totaled $31,450.00 (Ex. ECMC-9).

27. At the time of trial in 2010, following the termination of her employment at DPW
approximately six (6) months earlier, the Debtor was still unemployed.  (Ex. ECMC-10 at

---

[6]      See 29 U.S.C. §§2601-2619.

24).

## C.  The Debtor's Mental and Physical Ailments

28.  The Debtor suffers from Hepatitis C, pernicious anemia, hypertension and depression.  (Ex.

ECMC-10 at 25).

29.  The Debtor takes medications and sees a psychiatrist for her depression, which was

diagnosed at the age of twelve (12).  She also takes medication for her hypertension.  (Ex.

ECMC-10 at 28-29).

30.  The Debtor contracted hepatitis in or around 1992.  (Ex. ECMC-10 at 20, 25).

31.  Though the Debtor's anemia has been persistent since 1994, it became particularly

problematic in 2007.  Her anemia causes frequent bruising and extreme fatigue.  (N.T. at

73).

32.  Since 2007, the Debtor has visited the emergency room approximately fourteen (14) or

fifteen (15)  times.  Of those times, she had to be admitted overnight on three (3) occasions

because of pneumonia.  The Debtor's longest hospital stay resulting from an emergency

visit, was one (1) week.  (Id. at 74-75).

33.  Also in 2008, the Debtor had an operation, which included a hysterectomy, to better manage

her blood count associated with her anemia.  Since the operation, her anemic condition has

been under better control.  (Ex. ECMC-10 at 26).

## D.  The Debtor's Repayment History

34.  After graduation from college, but particularly since 1993, the Debtor has been receiving

some form of public assistance periodically .  (N.T. at 33).

35.  For the first two (2) years of her employment, the Debtor did not earn enough money to start

repaying her loans.  She did not make any payments and the loans became delinquent.  Two

(2) years after her default, her income tax returns were garnished.  (Id. at 57-58).

36.  Since 1994, the Debtor has had difficulty paying her regular living expenses because of her

illnesses.  (Id. at 29).

37.  In 2000, despite the fact that she was working at the time, she was evicted from her

residence and had no place for her children to stay, .  As a result, she lost custody of her

children for six (6) months.  (Id. at 30).

38.  She regained custody of her children after her father allowed her to move into his house,

which is not subject to a mortgage.  Subsequently, her father died and she inherited

ownership of the property.  As a result, she presently has neither a monthly mortgage or

rental obligation.  (Id. at 30-31, 78).

39.  Since 2000, even while she was working, the Debtor has applied for public benefits for

herself and her children, such as LIHEAP (a utility assistance program) and food stamps.

(Id. at 31).  She has faced the shutoff of her utility services regularly. She also has been

receiving food stamps since approximately 2003.   (Id. at 31-33; Ex. ECMC-10 at 37).[7]

40.  At some point in 2007, she requested some sort of hardship and/or forbearance from ECMC,

which was denied.  (N.T. at 33-34).

---

[7]       The Debtor described her situation at the time she filed her bankruptcy case in 2004 as
follows:

> My gas, my electric, my water was off. I had a car that I couldn't pay for. They
> had repossessed it. . . .  I had a garnishment I believe from whoever had my loans
> at the time.  The child support that I had been receiving for one of my children
> ended, the father disappeared. Oh, gosh.

(N.T. at 47).

41. The Debtor has not made voluntary payments on her educational loans; rather, payments were made only when her wages or tax returns were garnished.  (N.T. at 57).

**E.  The Debtor's Current Financial Condition**

42. In January 2010, after her termination from DPW, the Debtor's application for unemployment compensation was denied initially.  (N.T. at 28).  The Debtor successfully appealed the unemployment compensation determination and has been receiving unemployment compensation since March 2010.  (Id.).

43. The Debtor also appealed the decision to terminate her employment from DPW to the Department of Labor and Industry because she believes she can perform her job with some accommodation.  (Id. at 62).

44. The Debtor unsuccessfully applied for Social Security disability benefits on four (4) separate occasions over the years spanning her intermittent absences from work at DPW: 2005, 2006, 2007 and 2010.  (N.T. at 67-68, 85).

45. The Debtor has been unsuccessful in her attempt to seek employment since she left DPW in 2009.  (Id. at 65-66; Ex. ECMC-10 at 24).

46. The Debtor has five (5) children: James, Ngozi, Amir, Zindzi and Said Crawley.  She also has one (1) grandchild, Laini, who is Ngozi's child.  (Ex. ECMC-10 at 12, 34).

47. At the time of the trial, the Debtor lived with and supported three (3) of her own children (Amir, Zindzi and Said) and her grandchild, Laini, for whom she has physical custody, in the house she inherited from her father.

48. Also at the time of the trial, the Debtor was 47 years old, Amir was 18 years old, Zindzi was 12 years old and Said was 9 years old.  (Ex. ECMC-10, at 12).

49.   The Debtor's home is located in Philadelphia and free and clear from any encumbrances.

(N.T. at 58; 60-62; Ex. ECMC-10 at 29, 33-34).

50.   As of the trial date, the Debtor's monthly income consisted of: (a) $623.00/month in Social

Security and welfare benefits[8] plus unemployment compensation benefits of $828.00 per

month,[9] for a total of $1,451.00 per month. In addition, shortly before trial the Debtor was

receiving $717.00 per month in food stamps.[10]


**F.   The ICRP Program**

51.   The Debtor's Student Loan is eligible to be repaid through a consolidation option called the

Income Contingent Repayment Plan ("the ICRP") offered under the William D. Ford

Federal Direct Loan Program. (Ex. ECMC-11, ¶ 9).

52.   The ICRP would allow the Debtor to repay her educational loans with a payment calculated

---

[8]      At her deposition on February 4, 2010, the Debtor testified that she receives
approximately $205.00 per month in welfare benefits for support of Laini anda total of $418.00 per
month in Social Security disability benefits for her own two (2) children ($209.00 per month each). The
Social Security benefits are based on the disability and earnings of the children's father. (Ex. ECMC-10
at 51-52).

[9]      In her trial testimony, the Debtor did not quantify the amount of her monthly benefit, but
in her bankruptcy schedules subsequently filed under oath in this court, the Debtor disclosed an
unemployment compensation benefit totaling $828.00 per month. (See Bky. No. 10-12900, Doc. # 1;
Bky. No. 11-10875). I will consider the information set forth in the subsequently filed schedules because
I do not understand ECMC to dispute the amount of the Debtor's monthly unemployment compensation
income.

[10]      (Ex. ECMC-10 at 52). The finding of fact regarding the amount of the Debtor's monthly
food stamp benefit is derived from the Debtor's February 2010 deposition testimony, which preceded the
March 2010 successful outcome of her unemployment compensation administrative appeal. With the
increased income derived from the unemployment compensation benefits, it is likely that the Debtor's
food stamp benefits have decreased.

on the basis of her annual adjusted gross income, total loan amount, and family size.

53. Using her adjusted gross income as shown on her bankruptcy petition in Bankruptcy Case

No. 10-12900, along with her family size as claimed on her federal tax returns, her monthly

payment through the ICRP would be $0.00.  (Id., ¶¶ 13, 18)

54. The Debtor did not apply for assistance under the ICRP.  (N.T. at at 71-72).


### IV.  APPLICABLE LEGAL STANDARDS

### A.  Dischargeability Standard

### 1.  Statutory Authority – 11 U.S.C. §523(a)(8)

The discharge of student loans in a chapter 7 case is governed by 11 U.S.C.

§523(a)(8), which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an
> individual debtor from any debt --
>
>> (8) <u>unless excepting such debt from discharge under this
>> paragraph would impose an undue hardship on the debtor and
>> the debtor's dependents</u>, for –
>>
>>> (A)(i) an educational benefit overpayment or loan made,
>>> insured, or guaranteed by a governmental unit, or made
>>> under any program funded in whole or part by a
>>> governmental unit or nonprofit institution; or
>>>
>>> (ii) an obligation to repay funds received as an educational
>>> benefit, scholarship, or stipend; or
>>>
>>> (B) any other education loan that is a qualified education
>>> loan, as defined in section 221(d)(1) of the Internal
>>> Revenue Code of 1986, incurred by a debtor who is an
>>> individual . . . .

11 U.S.C. §523(a)(8) (emphasis added).

A debtor seeking to discharge student loan debt falling within the purview of §523(a)(8)

-12-

assumes the burden of establishing that excepting that debt from discharge will cause the debtor

and his or her dependents "undue hardship."  See Faish, 72 F.3d at 305-306; In re Zierden-

Landmesser, 249 B.R. 65, 69 (Bankr. M.D. Pa. 2000).

In deciding adversary proceedings brought under §523(a)(8), courts have focused on the

purposes that motivated Congress to treat the discharge of student loan obligations differently

than other debts.  One court reasoned:

> In enacting the undue hardship standard, Congress had to take into account
> the viability of the student loan program.  That program serves valuable
> purposes.  It affords individuals in all walks of life the opportunity to obtain
> an education, and with it the mobility and financial stability that an education
> can provide.  Indeed, without the program, many people would never receive
> any higher education, because their credit risks would preclude them from
> obtaining private commercial loans.

In re Frushour, 433 F.3d 393, 399 (4th Cir. 2005) (citation omitted); see also In re Brunner, 46

B.R. 752, 756 (S.D.N.Y. 1985) ("In return for giving aid to individuals who represent poor credit

risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances"),

aff'd 831 F.2d 395 (2d Cir. 1987).

Congress intended §523(a)(8)'s heightened standard for obtaining a student loan

discharge to help ensure the financial integrity of the student loan program by protecting it from

fiscal doom.  Frushour, 433 F.3d at 400.  Section 523(a)(8) is also said to help ensure "public

support for the [student loan] program by preventing debtors from easily discharging their debts

at the expense of the taxpayers who made possible their education."  Id.; see also Faish, 72 F.3d

at 306 (noting that the "undue hardship" standard "safeguards the financial integrity of the

student loan program by not permitting debtors who have obtained the substantial benefits of an

education funded by taxpayer dollars to dismiss their obligation simply because repayment of the

borrowed funds would require some major personal and financial sacrifices.").

In short, Congress enacted §523(a)(8) to foster "the twin goals of rescuing the student loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving debtors." In re Pelkowksi, 990 F.2d 737, 743 (3d Cir. 1993).

### 2.  The Brunner Test for Undue Hardship

As stated earlier in Part I, in Faish, the Third Circuit adopted the three-part test for evaluating whether "undue hardship" exists set forth by the Second Circuit in Brunner: (1) present inability to repay the loan while maintaining a minimal standard of living; (2) additional circumstances suggesting that the present inability to pay will continue for a significant period of the loan's repayment period; and (3) a past, good faith effort to repay the loan.

The debtor bears the burden of establishing each element of the Brunner test by a preponderance of the evidence. In re Brightful, 267 F.3d 324, 327 (3d Cir. 2001). All three elements must be satisfied individually before a discharge can be granted. If any one of the Brunner requirements is not satisfied, the bankruptcy court's inquiry must end there, with a finding of no dischargeability. Faish, 72 F.3d at 306.

The Court of Appeals has instructed that this test provides "the definitive, exclusive authority that bankruptcy courts must utilize to determine whether the 'undue hardship' exception applies." Id. "Equitable concerns or other extraneous factors not contemplated by the Brunner framework may not be imported into the court's analysis to support a finding of dischargeability." Id.

### B.  Preliminary Issue: The Relevant Time Period for Measuring Undue Hardship

In light of the fact that the Debtor re-opened her 2004 bankruptcy case several years after

the entry of her chapter 7 discharge, a threshold question is whether the Debtor's claim of undue

hardship should be measured based on her circumstances as they existed during the

administration of the 2004 bankruptcy case or whether the post-closing circumstances also

should be considered.

At the commencement of the trial, ECMC's counsel agreed that the court could consider

all of the evidence regarding the Debtor's circumstances through the date of trial.[11]  In its post-

trial brief, ECMC backtracked from its earlier position and argued that the court should restrict

its consideration of undue hardship to the Debtor's circumstances "at or near the petition date."

(ECMC's Post-Trial Mem. at 5).  ECMC cited several reported decision in support of its

position.[12]

---

[11]      I had the following colloquy with ECMC's attorney:

> THE COURT:        . . . . [F]or purposes of determining whether the plaintiff
> makes out her case, [is it] your position [that] I would be
> limited to the debtor's circumstances as they existed  prior to
> the entry of discharge in the 2004 case[?]
>
> MR. NEBLETT:     . . . . I think that is where we start.  . . . I mean, **the
> court is going to look at everything**.
>
> THE COURT:        Well, that is my question.  Can I consider events after the
> entry of discharge in evaluating [undue hardship]??
>
> MR. NEBLETT:     **I think you need to**, Your Honor.

(N.T. at 3-4) (emphasis added).

[12]      See In re Kapsin, 265 B.R. 778, 781 (Bankr. N.D. Ohio 2001) (denying motion to reopen
case to determine dischargeability of student loan because "any debtor who filed for bankruptcy relief
could at any time — say even ten or twenty years later — invoke the jurisdiction of [the bankruptcy
court]  . . .  creat[ing] the anomalous situation of a perpetual Chapter 7 case, and  . . .  render[ing]
superfluous .  . .  paragraph (a) of § 350 which provides that, '[a]fter an estate is fully administered and
the court has discharged the trustee, the court shall close the case.'"); see also In re Root, 318 B.R. 851,
854 (Bankr. W.D. Mo. 2004) (denying motion to reopen case to consider dischargeability of student loan

(continued...)

Initially, it is striking that the cases ECMC cites in support of its argument involve motions to reopen closed cases.  In <u>Kapsin</u>, <u>Root</u> and <u>Bugos</u>,[13] the courts decided only that the cases should not be reopened.  Strictly speaking, the cited cases never reached the issue of the temporal scope of the undue hardship inquiry in a bankruptcy case that has been reopened.  I acknowledge that the legal principle advocated by ECMC is consistent with the spirit, if not the narrow holdings, of the cited decisions.  However, the specific issue presented here is one that was not before the courts in <u>Kapsin</u>, <u>Root</u> and <u>Bugos</u>: <u>once a bankruptcy case has been reopened,</u> is the court's undue hardship inquiry restricted to circumstances existing at or around the time when discharge was entered (or the case was closed), or may post-discharge/post-closing circumstances be considered?[14]

---

[12](...continued)
due to unexplained delay of 13 years since entry of discharge); <u>In re Bugos</u>, 288 B.R. 435, 437 (Bankr. E.D. Va. 2003) (denying motion to reopen case to consider dischargeability of student loan, observing that a bankruptcy court "does not obtain lifetime jurisdiction over the debtor").

[13]    I am aware that ECMC also cites <u>In re Lien</u>, 224 B.R. 431 (Bankr. D. Alaska 1998), which was a decision in a student loan dischargeability adversary proceeding filed in a reopened bankruptcy case.  ECMC cites Lien for the proposition that a bankruptcy court should restrict its undue hardship analysis to consideration of circumstances arising within slightly more than a year after the entry of discharge.  However, respectfully, I suggest that ECMC has misread the holding in <u>Lien</u>.

      A careful reading of <u>Lien</u> suggests that the court was expanding the temporal scope of the undue hardship inquiry, not restricting it.  The court stated that it could consider the debtor's circumstance existing from the entry of discharge to slightly more than a year after the entry of discharge, because that happened to be a time period between the entry of the discharge and when the adversary trial was held and made the statement referenced by ECMC in response to the creditor's argument that post-petition circumstances should not be considered.  Indeed, the court stated that "[t]he law seems to be almost universal that the court is **not** restricted to the debtor's circumstances on the petition date in making a determination regarding undue hardship . . . ."  224 B.R. at 434.

[14]    Certainly, serious arguments existed against reopening this bankruptcy case and if those arguments had been presented, perhaps the motion to reopen may have been decided differently. However, those arguments were not presented to the court and the order reopening the bankruptcy case is
(continued...)

For two reasons, I will consider all of the evidence presented during the hearing,

including the Debtor's post-petition circumstances, in evaluating whether the Student Loan is

dischargeable.

First, as stated above, ECMC conceded that post-discharge circumstances could be

considered at the commencement of the hearing.  Consistent with that stance, ECMC took no

exception to the admission of the Debtor's evidence regarding her post-closing circumstances.  In

these circumstances, I consider the issue waived and not revivable by being resurrected in a post-

trial brief.

Alternatively, in the event the issue was not waived, I reject ECMC's argument on the

merits.  Regardless of the wisdom of reopening a closed bankruptcy case to consider the

dischargeability of a student loan, see nn.12, 14, supra, once the case has been reopened, the

better practice, consistent with the purposes of §523(a)(8), is for the court to consider all of the

evidence available as of the trial date regarding the debtor's circumstances.

In reaching this conclusion, I am persuaded by In re Walker, 427 B.R. 471 (B.A.P. 6th Cir.

2010).  In Walker, the court reasoned that because the test for undue hardship requires a

bankruptcy court to predict future circumstances, "[e]ven if there are no changed circumstances,

it makes no sense to require a court conducting a trial in 2008, for example, to go back to 2004

and make projections based on the 2004 facts, when it has the actual facts as they exist in 2008."

Id. at 483-84; accord In re Sederlund, 440 B.R. 168, 171 (B.A.P. 8th Cir. 2010); In re Bronsdon,

435 B.R. 791, 800 (B.A.P. 1st Cir. 2010).  But see In re Zygarewicz, 423 B.R. 909, 912-13

---

[14](...continued)
final.  I also note that the record reflects that the Debtor gave ECMC notice of the motion to reopen.  (See
Bky. No. 04-35514, Doc. # 92).

(Bankr. N.D. Cal. 2010).

### C. The Income Contingent Repayment Program

In asserting that the Debtor has not established her entitlement to a discharge of her student loan under the Brunner test, ECMC relies heavily on the Debtor's failure to request participation in the ICRP, despite her eligiblity for the program, as a basis for its position that the Debtor should be foreclosed from obtaining an undue hardship determination under §523(a)(8). Thus, before addressing the three (3) prongs of the Brunner test, it is helpful to describe briefly the legal framework of the ICRP.

Congress enacted the ICRP to "enable financial straitened education loan borrowers to repay loans by easing their burden of so doing." In re Shilling, 333 B.R. 716, 723 (Bankr. W.D. Pa. 2005). Under the ICRP, a borrower's annual payments can be decreased after the application of a formula that takes into account poverty guidelines and a borrower's adjusted gross income. See 34 C.F.R. §685.209. The required annual payment is determined by calculating the lesser of: (1) the amount the borrower would pay annually over twelve (12) years using standard amortization multiplied by an income percentage factor that corresponds to the borrower's adjusted gross income or (2) twenty percent of discretionary income. See 34 C.F.R. §685.209 (a)(2). The ICRP requires a minimum monthly payment of five dollars ($5.00), unless the borrower has no discretionary income under the above formula, in which case the monthly payment due is zero ($0.00). See 34 C.F.R. §685.209 (a)(6). The regulations establish the rate at which the interest accrues on the consolidated loan and if the borrower's payments are not sufficient to cover the accruing interest, some of it will be capitalized. See 34 C.F.R. §685.209 (c).

To qualify for the ICRP, the borrower must submit a formal application which, inter alia, authorizes the Internal Revenue Service to release tax information to the Secretary of Education. See 34 C.F.R. 685.209(c)(7); In re Sperazza, 366 B.R. 397, 409  (Bankr. E.D. Pa. 2007), aff'd, 2008 WL 818616 (E.D. Pa. 2008).  The borrower's monthly payments are then determined based upon income, subject to periodic reviews.  34 C.F.R. 685.209(a).  The payment period will not exceed twenty-five (25) years, after which time the canceled balance of the loan is discharged and treated as taxable income.  20 U.S.C. 1087e (d)(1)(D); 34 C.F.R. §685.209 (c)(4).

According to ECMC, the Debtor's failure to participate, despite the fact that her monthly payment under the ICRP would be zero ($0.00), should persuade the court that she has not met her burden in establishing an undue hardship under both the first and third prongs of the Brunner test.

## V.  APPLICATION OF THE THREE PRONGS OF THE BRUNNER TEST

### A.  The First Brunner Prong

#### 1.

The first prong of the Brunner test requires a debtor to show that at the debtor's current level of income and expenses, the debtor cannot maintain a minimal standard of living if forced to repay his student loans.  Faish, 72 F.3d at 304-05.  The "minimal standard of living"

> is not a fixed measure, and the concept is not defined by bright lines.  The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment."  While it does not relegate a debtor to the depths of  "abject poverty, a minimal standard of living does not accommodate 'luxury type expenses.'"  After providing for his or her basic needs, a debtor may not use her . . .  financial resources for discretionary expenditures in lieu of repaying student loan creditors.

-19-

In re Miller, 409 B.R. 299, 311 (Bankr. E.D. Pa. 2009) (quoting In re Johnson, 400 B.R. 167, 173

(Bankr. M.D. Pa. 2009) (internal citations omitted)).  "It is well established that maintaining a

minimal standard of living does not mean that [a][d]ebtor has to live at a poverty level to repay

[a] student loan."  In re Alston, 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003).  "Given the absence of

'bright lines,' perhaps the best that can be said is that 'a minimal standard of living lies

somewhere between poverty and mere difficulty.'"  Miller, 409 B.R. at 311 (quoting In re

McLaney, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004), aff'd as modified, 375 B.R. 666 (M.D.

Ala. 2007)).

     I adhere to the view, expressed in Miller, that the list of basic needs set forth in In re

Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001) is helpful in assessing the contours of a minimal

standard of living.  See Miller, 409 B.R. at 311-312.  Those elements of a "minimal standard of

living" identified in Ivory are:

> (1)  shelter that is furnished, clean, free of pests and climate-regulated with heating
>      and cooling;
>
> (2)  basic utilities such as electricity, water, gas and telephone;
>
> (3)  food and personal hygiene products;
>
> (4)   transportation or vehicles (and the ability to service and insure those vehicles);
>
> (5)  life insurance and health insurance (or the ability to pay for medical and dental
>      expenses);
>
> (6)  modest recreation.

269 B.R. at 899.

     Thus, in evaluating whether the Debtor has satisfied the first prong of the Brunner test, I

must first consider the expected cost of providing for the basic needs for the Debtor and her

dependents and then evaluate whether the Debtor has any additional funds available to make the

-20-

necessary payments toward her student loan.  In re Jones, 392 B.R. 116, 127 (Bankr. E.D. Pa.

2008); see also In re Burton, 339 B.R. 856, 870-71 (Bankr. E.D. Va. 2006) (once the court

determines the amount minimally necessary to ensure that the debtor's needs for food, shelter,

clothing and medical treatment are met, "the question is whether the debtor has additional funds

with which to make payments toward . . . [the] student loans").[15]


## 2.

No extended discussion is necessary to justify a finding that the Debtor lacks sufficient

income to provide a minimal standard of living for herself and her family.  It is undisputed that

the Debtor's monthly income is no more than $1,451.00 per month, plus food stamps, for a

household of five (5).  Based on my life experience alone, I conclude easily that a household of

five (5) cannot maintain a minimal standard of living on this income level, even if no portion of

the income is directed toward repayment of a student loan.[16]

---

[15]      Generally, an evaluation of income and expenses as presented in a debtor's bankruptcy
schedules is instrumental in the analysis as to whether the Debtor can maintain a minimal standard of
living.  Miller, 409 B.R. at 305; Johnson, 400 B.R. at 173.  However, it is not imperative for the court to
wade through a debtor's budget dollar-for-dollar to find all possible ways to create a surplus if the
expense level and living standard remains minimal.  Alan N. Resnick & Henry J. Sommer, eds., 4 Collier
on Bankruptcy ¶ 523.14[2], at 523–104-05 (15th rev. ed. 2011) (hereinafter, "Collier on Bankruptcy")
(citing In re Cline, 248 B.R. 347 (B.A.P. 8th Cir. 2000)).

[16]      See In re Douglas, 366 B.R. 241, 253 (Bankr. M.D. Ga. 2007) (court as fact finder "must
apply its common sense knowledge gained from ordinary observations in daily life and general
experience to determine whether [the] [d]ebtor's expenses are reasonable and necessary" to maintaining
minimal standard of living); see generally United States v. Cavera, 550 F.3d 180, 205 (2d Cir. 2008)
("the factfinder – whether judge or jury – [may] draw on common sense and experience in making any
determination") (citing 1 Leonard B. Sand et al., Modern Federal Jury Instructions ¶ 5.02, Instr. 5-4
(2005)); Kelley v. Sun Transp. Co., 900 F.2d 1027, 1032 (7th Cir. 1990) (quoting Burden v. Evansville
Materials, Inc., 840 F.2d 343, 348 (6th Cir. 1988)) ("the trial judge, sitting as a factfinder, was entitled to
use his own experience and common sense in determining [issues of fact]").

To the extent that reference to some objective standard is even necessary, I observe that

the Debtor's monthly income of $1,451.00 per month is substantially below the 2010 poverty

guidelines published by the U.S. Department of Health and Human Services.  At the time of trial,

the poverty level for a family of five (5) was $2,149.17 per month.  See 75 Fed. Reg. 45628-02

(Aug. 3, 2010); see also In re Mosely, 330 B.R. 832, 841 (Bankr. N.D. Ga. 2005), aff'd 494 F.3d

1320 (11th Cir. 2007) (debtor whose income falls below established poverty level presumptively

meets first prong); In re Rutherford, 317 B.R. 865, 878-79 (Bankr. N.D. Ala. 2004) (official

poverty level is below minimal standard of living).

The Debtor's monthly income also is below the $1,633.00 in monthly expenses for food

clothing and household and personal care items permitted in the IRS National Standards for

Allowable Living Expenses and the IRS Local Housing and Utility Standards.[17]  Even without

quantifying the other expenses the Debtor necessarily must incur in maintaining a minimal

standard of living (utilities, real estate taxes, health care, transportation, modest recreation), it is

obvious that her current income is inadequate to permit her to repay her student loan without

---

[17]    See
http://www.justice.gov/ust/eo/bapcpa/20100315/bci_data/national_expense_standards.htm.

       The IRS uses these expense standards to evaluate the financial condition of delinquent taxpayers to determine, for example, whether to initiate enforcement action, accept a taxpayer's offer in compromise or enter into an instalment repayment plan with the taxpayer.  It publishes these standards in its Financial Analysis Handbook, which is part of its Internal Revenue Manual ("the IRM").  See 4 I.R.M. Abr. & Ann. §5.15.1.1 (West 2009).  These expenses standards are also employed in evaluating whether a chapter 7 bankruptcy case is presumptively an "abuse" of chapter 7 and a debtor's ability to pay unsecured creditors in a chapter 13 case.  See 11 U.S.C. §§707(b)(2)(A)(ii)(I), 1325(b)(3).

       As I stated in Miller, the §523(a)(8) undue hardship test should not be measured solely by reference to IRS expense standards.  409 B.R. at 320 (scrutiny of debtor's expenses is "more rigid" under §523(a)(8) than under §§707(b) and 1325(b)).  However, the IRS expense standards can be "helpful" in providing "a frame of reference."  Id.

undue hardship.

ECMC acknowledges that the Plaintiff's finances are "very tight" and that, in some

circumstances, it might have conceded this prong.  (See ECMC's Post-Trial Memo at 8).  ECMC

argues, however, that even looking at the Debtor's tight finances and circumstances at the time of

trial, which ECMC acknowledges worsened since she filed her bankruptcy case in 2004, the fact

that she did not avail herself of the ICRP to effectively reduce her payment to zero ($0.00) is fatal

to her success under this first prong.  (Id. at 8-9).  Respectfully, I disagree.

Regardless whether the Debtor participates in the ICRP, the fact remains that the Debtor

cannot maintain a minimal standard of living if required to repay the loan at any payment level.

This reality renders the ICRP irrelevant under the first prong, even when the payment level

would be zero ($0.00).  To hold otherwise would make eligibility in the ICRP outcome

determinative in undue hardship determinations under §523(a)(8) and would result in the

delegation to an administrative agency, the Department of Education, the authority to determine

the dischargeability of certain student loans.  I agree with those courts and commentators who

perceive such a result as depriving the bankruptcy court of its proper role  – and the role intended

by Congress  – in dischargeability determinations.  See Educational Credit Management Corp. v.

Jesperson, 571 F.3d 775, 787-790 (8th Cir. 2009) (Bye, J., concurring and dissenting); In re

Furrow, 2004 WL 2238526, at *3 (Bankr. W.D. Mo. Sept. 28, 2004); In re  Limekemann, 314

B.R. 190, 195-96 (Bankr. N.D. Iowa 2004); In re Durrani, 311 B.R. 496, 506-09 (Bankr. N.D. Ill.

2004); In re Johnson, 299 B.R. 676, 681-82 (Bankr. M.D. Ga. 2003); Terrence L. Michael &

Janie M. Phelps, "Judges?!–We Don't Need No Stinking Judges!!!": The Discharge of Student

Loans in Bankruptcy Cases and the Income Contingent Repayment Plan, 38 Tex. Tech L. Rev.

73, 103-05 (2005) ("Michael and Phelps").

**B.  The Second <u>Brunner</u> Prong**

**1.**

Under the second prong of the <u>Brunner</u> test, the Debtor must demonstrate that "additional

circumstances exist indicating that [the debtor's present state of economic distress] is likely to

persist for a significant portion of the repayment period for [the] student loans,[18] and that this

inability to pay is attributable to reasons outside the debtor's control.[19]  The second prong

actually is comprised of two elements.  <u>See</u> <u>Collier on Bankruptcy</u> ¶ 523.14[2], at 523–105.  The

first is whether the debtor's financial difficulties are "likely" to continue.  <u>Id.</u>  Under this

element, a debtor is only required to establish that her financial situation is not likely to improve.

<u>Id.</u>  The second element is "temporal" and requires the debtor to prove that the duration of her

financial hardship will be for a significant period of the repayment period.  <u>Id.</u> at 523–105-06.

To satisfy the second prong, the Debtor must present "definitive evidence that the

Debtor's earning potential will not improve in the future."  <u>In re Fabrizio</u>, 369 B.R. 238, 248

(Bankr. W.D. Pa. 2007).  The types of circumstances that satisfy the second prong include

"long-term physical or mental problems precluding employment, lack of marketable job skills, or

the necessity of fully supporting several dependents which precludes sufficient income."

<u>Sperazza</u>, 366 B.R. at 411.[20]

---

[18]    <u>Faish</u>, 72 F.3d at 305 (quoting <u>Brunner</u>, 831 F.2d at 395).

[19]    <u>Brightful</u>, 267 F.3d at 328.

[20]    One court has collected twelve (12) factors that a court might consider:

> (1) serious mental or physical disability of the debtor or the debtor's dependents,
> which prevents employment or advancement;

(continued...)

The second prong puts the bankruptcy court in the "unenviable position of trying to predict what a debtor's circumstances will be for decades." In re Greenwood, 349 B.R. 795, 803 (Bankr. D. Ariz. 2006); see also In re Berry, 266 B.R. 359, 364 (Bankr. N.D. Ohio 2000) (referring to the second prong analysis as "speculative" in nature because it calls upon the court "to predict future events"); In re Young, 225 B.R. 312, 318 (Bankr. E.D. Pa. 1998) (observing that the debtor's future income potential was "difficult to predict"); In re Goranson, 183 B.R. 52, 55-56 (Bankr. W.D.N.Y. 1995) (referring to the "difficulty" of linking of undue hardship with the need "to predict the future").

"One of the best indicators of what will occur in the future, comes from events that have

---

[20](...continued)

        (2) the debtor's obligations to care for dependents;

        (3) lack of, or severely limited education;

        (4) poor quality of education;

        (5) lack of usable or marketable job skills;

        (6) underemployment;

        (7) maximized income potential in the chosen educational field, and no other more lucrative job skills;

        (8) limited number of years remaining in work life to allow payment of the loan;

        (9) age or other factors that prevent retraining or relocation as a means for payment of the loan;

        (10) lack of assets, whether or not exempt, which could be used to pay the loan;

        (11) potentially increasing expenses that outweigh any potential appreciation on the value of the debtor's assets and/or likely increases in the debtor's income; and

        (12) lack of better financial options elsewhere

In re Nys, 308 B.R. 436, 446–47 (B.A.P. 9th Cir. 2004) (citations omitted).

occurred in the past." Berry, 266 B.R. at 365-66.  If past is prologue, there is nothing in the

Debtor's history suggesting any trend toward economic stability that will enable her to repay her

student loans without undue hardship.  Nevertheless, under §523(a)(8), the court's ultimate focus

must be on the Debtor's future prospects; the essence of the inquiry under the second prong is

forward-looking.

As explained below, the debtor's employment history combined with the evidence

presented regarding her chronic medical problems convince me that the Debtor's current inability

to repay her student loan will continue for a substantial period into the future and therefore, the

Debtor has met her burden of proof on the second prong of the Brunner test.[21]

**2.**

In asserting that her present financial difficulties are not likely to improve, the Debtor

points to the loss of her DPW employment, followed by the period of unemployment, and her

---

[21]        Before proceeding further, I must make an observation regarding the application of the
second Brunner prong in this case.

The Debtor's inability to pay has already persisted for a substantial portion of the loan
repayment period.  Indeed, subject to any extensions of the loan term through deferments and
forbearance granted at the discretion of the lender (and the record does not reflect that any deferments or
forbearances were granted by the lender), the Student Loan matured about nine (9) years prior to the trial
of this matter.  If it were not for the existence of the ICRP, my analysis of the second Brunner prong
would end here because the Debtor established an inability to repay the loan over a substantial period of
the contractual term of her student loans.  However, because the ICRP permits a borrower to modify the
term of the student loan, most courts, without discussion, that the second Brunner prong requirement
(that the hardship persist for a substantial portion of the loan repayment period) refers to the ICRP
repayment period.  This assumption has been questioned and criticized.  See In re Coatney, 345 B.R. 905,
910 (Bankr. C.D. Ill. 2006); see also Michael & Phelps, 38 Tex. Tech. L. Rev. at 104.

Because I have determined the Debtor's student loans satisfy the second Brunner prong,
even considering the more expansive time frame that includes the ICRP "extension" of the contractual
loan term, it is unnecessary for me to decide the issue.  In the balance of the Opinion, I assume, without
deciding, that the second Brunner prong requires consideration of the loan term as extended by the ICRP.

various physical and emotional ailments.  In response, ECMC urges this court to reject what it characterizes as the Debtor's "self-serving" testimony regarding her health conditions as insufficient to satisfy this requirement.  (See ECMC's Post-Trial Mem. at 10).  In effect, ECMC posits that the Debtor's testimony, without corroborative expert medical evidence, cannot provide the factual foundation to carry her burden of proof under the second Brunner prong.

The issue raised by ECMC  –  whether a debtor's testimony, standing alone without corroboration by medical or other expert testimony, is sufficient to establish that existing health problems will impair the debtor's future earning prospects  –  arises regularly in §523(a)(8) litigation.

In Brightful, the Court of Appeals expressly rejected a rigid, per se rule that would require expert testimony in virtually all §523(a)(8) dischargeability proceedings in this Circuit.[22] Brightful, of course, is binding precedent in this court.  Two other courts of appeal have reached the same conclusion as Brightful.[23]  Cf. Burton, 339 B.R. at 874.[24]

---

[22]       The Brightful court stated:

> The Bankruptcy Court gave great weight to Brightful's alleged emotional and psychiatric infirmities, concluding from Brightful's testimony that she was emotionally unstable and that she had "glaring" psychiatric problems. We think these findings have some support in the record . . . .  PHEAA argues, however, that such findings require expert testimony, and cannot be made simply on the basis of the debtor's testimony. We disagree. It was appropriate for the Bankruptcy Court, as the trier of fact, to assess Brightful's testimony and draw reasonable conclusions regarding her mental and emotional state.

267 F.3d at 329-30.

        While the testimony at issue in Brightful involved the debtor's psychiatric problems, it is fair to assume that the court's holding applies to other health and medical conditions that are commonly the subject of expert testimony in civil litigation.

[23]       See Mosely, 494 F.3d at 1325 ("We . . . decline to adopt a rule requiring [the debtor] to
(continued...)

I read the developing case law to suggest that the debtor's testimony in combination with

other evidence may satisfy the debtor's evidentiary burden of showing that his or her present,

poor financial condition is likely to persist due to the existence and effect of a medical condition

and that courts may be flexible in considering different sources of "corroboration" of a debtor's

testimonial depiction of his or her medical condition and its likely future impact on the debtor's

ability to work and repay the student loan.  These potential corroborative sources include letters

from the debtor's doctors that are included in the record, the debtor's work history and history of

earned income.  Mosely, 494 F.3d at 1326; Barrett, 487 F.3d at 362-63.  The court may also

---

[23](...continued)
submit independent medical evidence to corroborate his testimony that his depression and back problems
were additional circumstances likely to render him unable to repay his student loans"); In re Barrett, 487
F.3d 353, 360 (6th Cir. 2007) (rejecting ECMC's position that debtor was required to produce expert
witness to corroborate his health status, and adopting holding of bankruptcy appellate panel that a
requirement of corroborating evidence "'imposes an unnecessary and undue burden on Plaintiff in
establishing his burden of proof,' if corroborating evidence is understood to be limited to expert medical
testimony") (quoting 337 B.R. 896, 903 (B.A.P. 6th Cir. 2006)); see also In re Marcotte, 2011 WL
1518095, at *12 n.18 (Bankr. D.S.C. Apr. 20, 2011).

        One bankruptcy court in the Ninth Circuit has suggested that the First Circuit's decision
in In re Nash, 446 B.R. 188 (1st Cir. 2006) is to the contrary.  See In re Ristow, 2011 WL 2604841, at *4
n.5 (Bankr. D. Ariz. June 30, 2011).  However, a bankruptcy court in the First Circuit has not read Nash
so broadly.  See In re Tucker, 2009 WL 2877906, at *9 (Bankr. D.N.H. Sept. 3, 2009) ("Nash never
created a rule requiring debtors with mental conditions seeking to discharge student loans to offer
corroborating medical evidence to prove future inability to work. The court only found that the
bankruptcy court did not err in finding the debtor had not met her burden of proof.").  The Tucker court
also makes the incisive point that the shorter the time period between the onset of the condition's
symptoms or the debtor's diagnosis and the debtor's decision to file bankruptcy and discharge the student
loans or stop working, the greater need for some independent, corroborating medical evidence on the
debtor's future prospects.

[24]        The Burton decision surveys much of the case law and, at one point in the decision states
that it would follow what it termed the majority rule  – that "substantial and credible evidence, such as
corroborating evidence, must be presented for the debtor to sustain his burden of proof regarding his
medical condition." 339 B.R. at 874.  However, even the Burton court was at least somewhat equivocal
regarding its apparent holding, stating that in light of the practical difficulties facing indigent debtors
who are unable to pay for expert medical testimony, it did not mean to "suggest [that] expert testimony is
the only method of corroboration available to debtors."  339 B.R. at 879.

consider whether the defendant has disputed the existence of the medical condition or offered any

contrary evidence to rebut the debtor's testimony.  See, e.g., Barrett, 487 F.3d at 363; In re Cekic-

Torres, 431 B.R. 785, 794 (Bankr. N.D. Ohio 2010).

At the same time, however, a debtor who presents only his or her testimony runs a

substantial risk that the evidence will fall short of meeting the evidentiary burden.  Absent expert

testimony, there may be an evidentiary deficit with respect to either the existence and nature of

the asserted medical condition itself[25] or the negative impact the condition will likely have on the

debtor's ability to work and generate sufficient income to repay the student loan.[26]

Ultimately, the court's determination regarding the sufficiency of the debtor's evidence

---

[25]    In Cekic-Torres, the court observed that "a debtor's testimony regarding a medical
condition will often fall short under the second prong of the Brunner test" and further stated that "the
Court, given the paucity of corroborating evidence, is not usually disposed to find in favor of the
Debtor."  431 B.R. at 793 (citing authorities).

Interestingly, the decision in Cekic-Torres was the exception that proves the rule as the
court ultimately concluded:

> [I]n limited circumstances, when a debtor's medical condition, health status and inability
> to work cannot be reasonably controverted, a debtor's testimony may be accepted at face
> value. As now explained, based upon the Debtor's physical demeanor, the Court,
> although bothered by the lack of corroborating evidence, is persuaded that such a limited
> circumstance exists here, warranting a finding that the Debtor's testimony regarding her
> medical problems and inability to work is credible.

Id. (citation omitted).

[26]    In Brightful, for example, the court pointed out that while the bankruptcy court's finding
that the debtor had psychiatric problems was supported adequately by the debtor's testimony, even
without expert testimony, the debtor nonetheless had not met her burden of proof as to the second
Brunner prong because she did not produce evidence that explained why her particular problems would
preclude her from working full time and generating sufficient income to repay her student loan.  267 F.3d
at 329; accord In re Traversa, 2010 WL 1541443, at *10 (Bankr. D. Conn. Apr. 15, 2010); In re Steers,
2008 WL 2038835, * 4 (Bankr. D.N.J. May 12, 2008); Burton, 339 B.R. at 880; In re Matthews, 324 B.R.
319, 322-23 (Bankr. N.D. Ohio 2004).  By comparison, in Mosely, 494 F.3d at 1327 and Barrett, 487
F.3d at 363, the courts of appeal found sufficient the debtor's testimony that specifically addressed the
impact of the debtor's health on the debtor's ability to work.

under the second <u>Brunner</u> prong is not susceptible to any simple, "legal short-cuts."  When the

debtor's legal theory under the second prong is based on asserted medical and/or psychological

ailments and the debtor does not present expert testimony, the court may consider the debtor's

testimony regarding the existence of the medical problem and the effect it has on the debtor.  But,

it then must engage in a careful consideration of the other evidence in the record in determining

whether the debtor's testimony is convincing, credible and sufficient to satisfy the debtor's

burden of proof.


<strong>3.</strong>

In this proceeding, the Debtor testified that she suffers from certain medical conditions:

hepatitis C, pernicious anemia, hypertension and depression.

With respect to her depression, she supported her testimony with written certifications

from a physician, introduced into evidence with ECMC's consent.  In a written certification

submitted to DPW in 2005, the physician described the Debtor's depression as "severe" and a

"lifetime" condition which would cause "episodic flareups periodically preventing [the Debtor]

from performing his/her job functions."  (Ex. P-1, at 7,8).  In two later certifications to DPW in

2009 (one in January, the other in July), the physician made much the same assessment as to the

likelihood of episodic incapacity, stating that the Debtor "needs to be off work when severely

depressed."  (<u>Id.</u> at 14).  A 2008 written certification to DPW from a different physician confirms

the existence of the Debtor's anemia, which was described as "severe" and which, in conjunction

with a fibroid condition, would require surgery that would render the Debtor unable to work.  (<u>Id.</u>

at 2).  However, in the 2008 certification, the physician also opined that it would <u>not</u> be necessary

for the Debtor to be absent from work intermittently or to work on a reduced-time schedule as a

-30-

result of the condition following a six (6) week recovery period.  (Id.).

Based on this record, I am satisfied that the Debtor suffers from significant health and psychological issues and it does not appear that ECMC disputes this.  Thus, the determinative issue is whether the Debtor's health problems impair her ability to work and generate income to a sufficient degree to support a finding in her favor under the second Brunner prong.

While this second issue is a close call in the absence of corroborative expert testimony regarding the Debtor's prognosis, I find that the Debtor has met her burden of proof.  I found credible the Debtor's testimony that she genuinely wants to work but can do so only on either a part-time or periodic basis.

This is not a case in which the Debtor is relying solely on her own uncorroborated testimony in asking the court to make findings about her health problems and their impact on her future earning capacity. The Debtor's perception of her limitations finds support in the record in two places.

First, the Debtor's pessimism is rationally based on her past experience at DPW, which was marked by intermittent absences from work, with the accompanying loss of income.  I have no reason to believe that the time the Debtor lost from work at DPW during almost a decade of employment was the result of the Debtor's conscious, voluntary choice.  Her medical problems were verified by physicians and it is counterintuitive to believe that the Debtor would purposely put herself and her children through the hardships they faced due to the reduction in her income. Thus, although the Debtor has a college degree and has skills that may permit her to obtain employment at a salary level sufficient to permit some repayment of the Student Loan if she could work full time, I am persuaded that it is more likely than not that she will not be able to work full-time with regularity.

-31-

Further, there is at least some independent medical evidence indicating that the Debtor's two primary health problems (anemia and depression) that plagued her while she worked at DPW are chronic conditions.  This further suggests that these health problems will continue to interfere with the Debtor's work life.

While the discharge of student loans obviously is disfavored under the Bankruptcy Code (for the reasons explained in Part IV.A.1., supra,) and the burden of proof is on the Debtor, the evidentiary burden nonetheless, is a preponderance of the evidence. Consideration of all of the evidence convinces me that it is more likely than not that even if the Debtor could obtain the type of job that she envisions, her future employment will not generate sufficient income to allow for repayment of the Student Loan without imposing undue hardship on the Debtor and her dependent children.

In reaching this conclusion, I am also influenced (to a lesser degree) by the Debtor's age (47) and the fact that she three (3) children, the youngest of which is 9 years old.  Thus, she is looking at least nine (9) more years of child rearing and perhaps more, if she is obliged to maintain primary responsibility for raising her grandchild, who is currently only three (3) years old.  Certainly, as each grown child leaves the house, the Debtor should experience some degree of financial relief.  However, this will occur gradually and not for a number of years.  Before the Debtor can expect to have a significantly reduced financial obligation for all of her dependents, she will be well into her late 50's and the Student Loan already will have been in pay status for almost thirty-five (35) years.

**4.**

ECMC contends that I should not credit the Debtor's testimony regarding her asserted

bleak future financial prospects on the ground that her testimony was inherently contradictory.

ECMC points out that the Debtor not only applied for and was denied Social Security Disability

benefits, but also has been receiving unemployment compensation, a public benefit for which the

ability to work is a prerequisite.  (Id. at 11).  She also is appealing the decision to terminate her

employment due to her absences because she believes she is able to do some work with an

accommodation.

       I do not perceive the Debtor's conduct to undermine the credibility of her trial

testimony.  At trial, she explained the circumstances that caused her to apply for the two (2)

different types of public benefits.  Without reviewing in detail the entire history of the Debtor's

multiple applications for Social Security disability (in 2005, 2006, 2007 and 2010) and her

unemployment compensation benefits application in 2009, suffice it to say that I credit her

explanation that she applied for both types of public benefits because she believes that she is able

to work in some capacity with an accommodation for her various physical conditions, but that

she might also be disabled enough to qualify for some kind of consistent income assistance.  (See

N.T. at 28-29, 88).  The Debtor's perception of the eligibility requirements for unemployment

compensation and Social Security disability benefits may or may not be correct, but that does not

cause me to question the veracity of her testimony regarding her health problems.


### C.  Good Faith

      The third and final prong in the Brunner analysis requires the Debtor to establish that she

made a good faith effort to repay her loans.  Faish, 72 F.3d at 305.  Under §523(a)(8), good faith

is measured, in large part, by the debtor's efforts to obtain employment, maximize income, and

minimize expenses.  E.g., Jones, 392 B.R. at 130.  Also, "[f]undamental to the good faith inquiry

is the notion that the debtor did not willfully or negligently cause his own default, but that his condition results from factors beyond his control." Id. at 130; accord In re Coco, 335 F. App'x. 224, at *2 (3d Cir. 2009) (non-precedential).[27]  Good faith, in this context, is essentially an inquiry into whether the debtor has consciously or irresponsibly disregarded his or her repayment obligation – or, instead, whether there is some justification for the debtor's default and ongoing inability to repay the loan.  See In re Lehman, 226 B.R. 805, 808 (Bankr. D. Vt. 1998).

ECMC's presents two arguments in support of its contention that the Debtor has not proven her good faith under the third prong: (1) her failure to participate in the ICRP and (2) her failure to make any voluntary payment on the Student Loan.[28]

## 1.

ECMC's first, and principal argument is grounded in the Debtor's failure to participate in the ICRP.  (See ECMC's Post-Trial Mem at 13- 14).  Under the ICRP, the Debtor would have a monthly payment of zero (0.00) based on her level of household income.  (Id. at 13).  If the Debtor participated in the ICRP, she would be treated as being current on her student loan, she would be eligible for deferments and forbearance and she would avoid further garnishment of her wages and tax returns.  (Ex. ECMC-11, ¶ 16).  ECMC suggests that her decision to not take

---

[27]    In another non-precedential decision, the Third Circuit also described two non-exclusive factors that may be considered in the good faith determination: "(1) whether the debtor incurred substantial expenses beyond those required to pay for basic necessities and (2) whether the debtor made efforts to restructure his loan before filing his petition in bankruptcy."  Pelliccia v. U.S. Dept. of Educ., 67 F. App'x. 88, 91 (3d Cir. 2003) (non-precedential).

[28]    I note that ECMC does not raise an argument frequently made by creditor-defendants under the third Brunner prong.  ECMC does not assert that the Debtor failed to make efforts to maximize her income and minimize her expenses.

advantage of this benefit evidences a lack of good faith.

There is a division in the case law regarding the applicability of the ICRP under the Brunner analysis.  See Michael & Phelps, 38 Tex. Tech. L. Rev. at 92-102 (collecting cases). While all courts consider the Debtor's willingness to participate in the IRCP as a factor to be considered under the good faith prong of the <u>Brunner</u> test,[29] the cases diverge as to the weight the court should place on that choice of the debtor.  <u>Id.</u> at 92-102.  The courts' approaches range from a "per se" view,[30] to the view that the ICRP is a significant factor,[31] to the view that it is "one factor" to be considered,[32] to the view that it is relatively insignificant.[33]  <u>See</u> Michael & Phelps, 38 Tex. Tech. L. Rev. at 92-101.

ECMC urges a relatively hard-line approach: that a debtor's decision whether to participate in the ICRP should be a significant factor to consider when evaluating good faith.

---

[29]    Some courts also have entertained the issue of the ICRP under the first and second prongs of <u>Brunner</u>.  <u>See, e.g.</u>, <u>Durrani</u>, 311 B.R. at 506-09 (first prong); <u>Educ. Credit Mgmt. Corp. v. Stanley</u>, 300 B.R. 813, 817-19 (N.D. Fla. 2003) (first prong)<i>;</i> <u>In re Archibald</u>, 280 B.R. 222, 227-28 (Bankr. S.D. Ind. 2002) (second prong).  While I recognize ECMC also argued the ICRP is a factor under the first prong, I found its applicability immaterial to my analysis.  <u>See</u> Part IV.C.2, <u>supra</u>.

[30]    In other words, these courts effectively hold that availability of the ICRP controls the Brunner good faith analysis.  See, e.g<i>.</i>, <u>In re Birrane</u>, 287 B.R. 490, 500 (B.A.P. 9th Cir. 2002);  <u>In re Bard-Prinzing</u>, 311 B.R. 219, 229 (Bankr. N.D. Ill. 2004); <u>In re DeRose</u>, 316 B.R. 606, 609 (Bankr. W.D.N.Y. 2004).

[31]    <u>See, e.g.</u>, <u>In re Alderete</u>, 412 F.3d 1200, 1206 (10th Cir. 2005); <u>In re Goodman</u>, 449 B.R. 287, 296 (Bankr. N.D. Ohio 2011); <u>Shilling</u>, 333 B.R. at 723.

[32]    <u>See</u> <u>Jones</u>, 392 B.R. at 130; <u>Alston</u>, 297 B.R. at 418; <u>In re Newman</u>, 304 B.R. 188, 195 (Bankr. E.D. Pa. 2002); In re Waterston, 2002 WL 31856714, at *8 (Bankr. E.D. Pa. Nov. 26, 2002).

[33]    <u>See</u> In re Jackson, 2004 WL 952882, at *8 (N.D. Ohio Apr. 30, 2004); <u>In re Johnson</u>, 299 B.R. 676 (Bankr. M.D. Ga. 2003).

(See ECMC's Post-Trial Mem at 14).[34]

I decline to analyze the issue by adopting a single rule that quantifies the degree of "significance" of the ICRP under the good faith analysis required by the Brunner third prong. The role the ICRP plays in assessing a debtor's good faith is necessarily dependent on the circumstances of the particular debtor seeking discharge of his or her student loans. Because those circumstances vary tremendously, I do not find it helpful in evaluating a debtor's good faith to attach a universal label to the role of the ICRP, such as "significant" or "insignificant" or something in-between. The weight of the ICRP evidence could be any of the above depending on the debtor's circumstances. To reach a fair and just result, the court's consideration of the significance, if any, of the debtor's failure to participate in the ICRP must be tailored based on the individualized circumstances of the debtor who is before the court.

Based on the facts in this case, I conclude that the Debtor's decision not to participate in the ICRP is not indicative of a lack of good faith warranting denial of her request for discharge of the Student Loan based on undue hardship. Like many other courts, I do not find it determinative that the Debtor could have no payment under the ICRP. See, e.g., Durrani, 311 B.R. at 506; In re Rutherford, 317 B.R. 865, 880-81 (Bankr. N.D. Ala. 2004). The Debtor's decision must be evaluated in a larger context.

The Debtor made her request for the discharge of the Student Loan almost twenty-five (25) years into the loan term. Prior to seeking discharge of the debt, she had made payments on

---

[34]    To the extent that ECMC's position implicitly assumes that a debtor's decision not to participate in the program does not automatically preclude an undue hardship discharge under §523(a)(8), I agree, for the reasons articulated in Jesperson, 571 F.3d at 787-790 (Bye, J., concurring and dissenting); Durrani, 311 B.R. at 506-09, and Michael and Phelps, 38 Tex. Tech. L. Rev. at 103-05.

the loan (albeit "involuntarily," which raises another issue, to be discussed below) during at least

some of the years in which she was employed.  She sought bankruptcy relief several times and

only requested the discharge of the Student Loan in 2009.  By that time, the Debtor had been

struggling to make ends meet for herself and her children for more than ten (10) years, perhaps

living below the poverty level at times during that period.  She attributed her financial difficulties

to her medical problems which limited her ability to work full-time at DPW.

　　　　In these circumstances, the decision to seek a discharge of the Student Loan appears

motivated more by the Debtor's sincere belief that her situation was dire and would not improve

and an implicit sense that participation in the ICRP would be futile, rather than a bad faith desire

to avoid repayment of the Student Loan.  See Coco, 335 F. App'x 224, at *4  (non-precedential)

(remanding case because the bankruptcy court placed too much reliance on the debtor's lack of

participation in ICRP, reasoning that "[i]n light of [the debtor's evidence that her] purported

financial and medical circumstances . . . will continue indefinitely, her decision to forgo enrolling

in the ICRP seems reasonable"); accord Ed. Credit Mgmt. Corp. v. Curiston, 351 B.R. 22, 32 (D.

Conn. 2006); Johnson, 299 B.R. at 682; Waterston, 2002 WL 31856714, at *8.

　　　　For these reasons, I conclude the Debtor's lack of participation in the ICRP should not

result in a finding that she has not acted in good faith as required by the third prong of the

Brunner test.


**2.**

　　　　ECMC also argues that the Debtor failed to make a good faith effort to repay the Student

Loan within the meaning of the third Brunner prong, because she made no voluntary payments on

the Student Loan, even when she was gainfully employed.  (ECMC's Post-Trial Mem at 14).

While this argument may have some superficial appeal, based on the circumstances in this case, I

cannot agree that the absence of voluntary payments should bar the discharge of the Student

Loan.

 This is not a case in which the Debtor simply ignored her repayment obligation and

attempted to avoid all contact with her lender.[35]  She testified that, due to her financial

difficulties, she regularly requested payment deferments from the lender.  (See N.T. at 20, 57).

 Nor is this a case in which the Debtor made no payments at all.[36]  The record suggests

that Debtor actually made substantial payments on the Student Loan, albeit "involuntarily."[37]

The Debtor's testimony suggests that, beginning in the late 1980's and continuing throughout her

---

[35]  See In re Mason, 303 B.R. 459, 467 (Bankr. D. Idaho 2004), aff'd 315 B.R. 554 (B.A.P. 9th Cir. 2004) (under good faith prong, "[c]onsideration is also placed on a debtor's efforts to deal with repaying student loans, be that through making payments, seeking deferments when unable to pay, or negotiating manageable repayment terms"); In re Maulin, 190 B.R. 153, 156 (Bankr. W.D.N.Y. 1995) (proof good faith "does not necessarily command a history of payment. . . . [but] does require a history of effort to achieve repayment such as when a borrower diligently uses a deferment period to attempt the reorganization of her financial affairs").

[36]  Even if she made no payments, that fact would not necessarily establish a lack of good faith.  The failure to have made any repayments on a student loan is not a litmus test for good faith under the third prong of the Brunner test.  The good faith determination depends on the reasons why the Debtor did not make the payments.  See, e.g., Douglas, 366 B.R. at 259; Waterston, 2002 WL 31856714, at *8.

[37]  All but one of the loans (a loan of only $709.00) carried an interest rate of 7.00% once they entered pay status.  (Ex. D-11).  For purposes of this estimation, I will ignore the modest component of the Student Loan that carried a higher interest rate.  Thus, had the Debtor made no payments on the loans from 1986 through 2010, a period of approximately twenty-four (24) years (or 288 months), interest totaling approximately $16,800.00 would have accrued on the $10,000.00 loan.  (10,000.00 x .07 x 24 = 16,800.00).  Thus, if the Debtor had never made a payment, the loan balance would have been in excess of $26,800.00 as opposed to $19,726.35, as calculated by ECMC.  Considering that the loan balance undoubtedly includes late charges (imposed at least during the initial fifteen (15) year loan term) and, more likely than not collection expenses, it is clear that the Debtor made more than (and perhaps substantially more than) $7,000.00 in payments on the Student Loan.

working life, she made the payments, initially through interception of federal income tax refunds and later through garnishment of her wages (at DPW).  (See id. at 20, 33-34, 57).

While the Debtor's method of making payments was not truly "voluntary," it appears that the she acquiesced to the seizure of her money and offered no resistance until some time in the mid-2000's when she was concerned that the garnishment of her earnings left her with insufficient funds to provide life's necessities for herself and her children.[38]  It also appears that, after learning early on that the lender would act aggressively in exercising its collection remedies, the Debtor came to rely on the collection system to take money from her when she had money available for repaying the Student Loan.  This passive manner of dealing with her student loan obligation may not have been ideal, but this does not appear to be a case in which the Debtor attempted to "game" the student loan system or evade repayment, especially when one considers that throughout the entire loan repayment period, the Debtor has struggled financially and perhaps lived, at times, below the poverty line.

For these reasons, I do not construe the Debtor's conduct, in failing to make voluntary repayments indicative of a lack of good faith warranting denial of her request for a discharge of the Student Loan.  Accord Douglas, 366 B.R. at 360.

---

[38]        The Debtor testified:

> I guess what I want to say, too, is that it's not like I don't want to pay ECMC.
> It's just that I don't think I would ever be able to pay what they wanted, and the
> garnishment was so severe that I just couldn't live. I couldn't live with my
> family. They were taking fifteen percent of my income and I was only working
> part-time.

(See id. at 33).  I credit this testimony regarding the Debtor's subjective intent.

## VI.  CONCLUSION

What is initially most striking in this proceeding is the age of the loans the Debtor seeks to discharge.  These loans have been in pay status for about a quarter of a century.  The record is not fulsome for the entire twenty-five (25) year repayment period, but the evidence does demonstrate that during much of the repayment period, the Debtor's life has been marked by illness, erratic employment, reliance upon public assistance and food stamps and frequent worries about food, clothing, shelter and maintenance of utility service for herself and her two (and later three) minor children.  Even when the Debtor found a position that paid an adequate salary in 2000 (fifteen (15) years into the repayment period), health problems prevented her from maximizing her income earning potential and eventually caused her to be terminated by her employer, DPW.  Presently, she is living at or below the poverty level and the record also supports the conclusion that her inability to repay this loan is not likely to abate in the foreseeable future.  Finally, the Debtor has not ignored her student loan obligation and, in fact, has made some meaningful payments on the loan, which leads me to conclude that she has acted in good faith.

Having met her burden under all three prongs of the <u>Brunner</u> test, the Debtor has established that repaying her student loans would impose an undue hardship.  I therefore find that the Debtor's student loans currently held by ECMC should be discharged pursuant to 11 U.S.C. §523(a)(8).

Date:  __October 24, 2011__                                  _____
                                                             **ERIC L. FRANK**
                                                             **U.S. BANKRUPTCY JUDGE**